IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

JAMES RZEPLINSKI,

                Plaintiff,

  v.

TAMMY MAASSEN, LIZZIE TEGELS,
JODI DAUGHERTY, TOMMY ONJUKKA,
EDWARD WALL, DEIRDRE MORGAN,
CHARLES FACKTOR, WELCOME ROSE,
BARBARA DELAP, and JODI DEROSA,[1]

                Defendants.

OPINION & ORDER

14-cv-820-jdp

---

Plaintiff James Rzeplinski, a prisoner at the Jackson Correctional Institution, brings claims that defendant Wisconsin Department of Corrections officials failed to address his broken dentures, leading to him suffering pain and bleeding gums. Defendants have filed a motion for summary judgment, in which they contend that they did not act with deliberate indifference toward Rzeplinski's problems.

Rzeplinski's frustration at the delay in getting his dentures fixed is understandable. But the lack of dentures or teeth does not itself pose a serious health problem. I will grant defendants' motion because Rzeplinski fails to show that he brought a serious medical need to defendants' attention. In his briefing, Rzeplinski attempts to resurrect previously dismissed Eighth Amendment failure-to-protect claims regarding sexual comments made to him by other prisoners. I conclude that even had Rzeplinski properly brought these claims in this lawsuit, I would deny them, so there is no reason to consider amending the complaint.

---

[1] I have amended the caption to reflect the parties' full names.

FINDINGS OF FACT

I draw the following facts from the parties' proposed findings of fact and supporting materials.

Plaintiff James Rzeplinski is a prisoner housed at the Jackson Correctional Institution (JCI), located in Black River Falls, Wisconsin. Defendant Lizzie Tegels is the JCI warden, defendant Tammy Maassen is the JCI health services manager, and defendant Jodi Dougherty is the JCI institution complaint examiner. Dr. Tommy Onjukka is the dental supervisor for a region that includes JCI and eight other facilities, and was acting as the fill-in dentist at JCI during the relevant time. The remaining defendants all worked in the DOC's central office. Ed Wall was the secretary, Deirdre Morgan was the deputy secretary, Charles Facktor and Welcome Rose were corrections complaint examiners, Dr. Barbara De Lap was the Bureau of Health Services dental director, and Jody DeRosa was a Bureau of Health Services nursing coordinator.

Under DOC Division of Adult Institutions policies, dentists or nurses triage incoming dental requests from inmates. Dental emergencies ("dental problem[s] causing a life threatening condition and requiring immediate care") and urgent conditions ("those which, if not completed in a timely manner, could result in undue pain and suffering") are handled first. "Routine" dental problems are defined as "conditions that are asymptomatic and for which a delay in completion of up to one year would not result in serious risk." These requests get lower priority and are placed on a wait list, unless a change of condition alters the triage status. When an inmate indicates that he is in pain, the dentist addresses it as if it were an urgent problem, unless the dentist can determine through record review that the matter is not urgent.

The need for dentures, even full dentures, is usually considered a "routine" dental issue, because being toothless does not harm a patient's overall health, unless there are signs of notable weight loss or medical complications like pain, swelling, or infection.[2] Weight loss may occur because it is sometimes more difficult for a patient to eat a normal diet without teeth. In these situations, a soft diet may be ordered for the inmate. Dental staff does not consider self-inflicted pain from personal diet choice "urgent" pain because it is easily addressed by a change of diet, without medical intervention. Because it is "routine" procedure, it may take up to 12 months for a prisoner to receive dentures. Rzeplinski's complete set of dentures was finished on November 25, 2013.

From March 2014 to February 2015, JCI had a vacancy at its full-time dentist position. While JCI was without a full-time dentist, defendant Onjukka provided direct dental care to patients at the facility. He was not able to work full time at JCI because he still needed to attend to his responsibilities at the other facilities he supervised. Although De Lap was not the final decision maker in hiring dentists, she was responsible for carrying out the hiring process from reviewing applications and conducting interviews to making hiring recommendations. The process of hiring a dentist takes several months. The process can take longer for certain facilities, especially those, like JCI, located in more rural areas.

Rzeplinski submitted a health service request on April 16, 2014, in which he reported that a piece of his upper denture was broken off and he needed a dentist to fix it. The service

---

[2] Plaintiff argues that the dental polices actually say that a dental repair is only a "routine" issue when the "denture remains functional." *See* "Triage of Dental Service Requests and Prioritizing Appointments" policy, Dkt. 19-2 at 3. But this is listed as only one example of a routine problem. The "Routine Dental Treatments" policy states explicitly that "[a]n edentulous state does not, by itself, adversely affect an inmate patient's overall health." Dkt. 19-3 at 7.

request was forwarded to Onjukka because it pertained to dental issues. Rzeplinski made no complaints of pain, swelling, weight loss, or any signs of infection. Two days later, Onjukka responded, telling Rzeplinski that he was on the denture wait list. At any given time, JCI has about 70 to 90 inmates on the denture wait list.

On May 6, 2014, Rzeplinski submitted a health service request stating, "My upper denture has broken completely in half. I have no teeth to use and need to get in to see you ASAP. Thank you! I was put on a waiting list 2 weeks ago when they (first) crack." Onjukka responded three days later, telling Rzeplinski that he would be called for an evaluation for repair of his denture.

On May 13, 2014, Onjukka saw Rzeplinski and confirmed that the denture was broken. He also concluded that Rzeplinski would need a permanent "reline" of the dentures in addition to repairing them, so that the dentures would fit correctly as Rzeplinski's mouth changed. Because Rzeplinski did not complain of pain, and he did not exhibit any swelling or signs of infection, his broken dentures and need for a permanent reline was considered a routine dental need. As a result, he was put on the routine denture waiting list.

On May 21, 2014, Rzeplinski weighed 223 pounds.

On June 18, 2014, Rzeplinski submitted a dental service request in which he wrote, "I again need my dentures fixed you've seen them and said you would put me on a list. It's been '2 months.'" About a week later, Onjukka responded, telling Rzeplinski that he was still on the list and that Dental Services could only see emergency patients until JCI got a full-time dentist.

On July 9, 2014, Rzeplinski weighed 211 pounds. He suffered the flu in June 2014. At this appointment, Rzeplinski did not report any concerns about pain in his mouth or

ability to eat. Because he was still a normal weight for his size, the weight loss was not considered a serious medical concern.

On July 22, 2014, defendant Warden Tegels's office received an "Interview/Information Request" from Rzeplinski stating, "My dentures need to be fixed and nothings being done to get them done. It's been over 3 months." Attached to this request was a letter, in which Rzeplinski stated:

> I have been trying to get my new dentures fixed since 4-16-14. They called me up to look at them and said they could be fixed. Since then I have been waiting to no avail. I then wrote a slip addressed to T. Maasen the HSU manager. She never responded to my request and that's why I am writing you. There's no reason my denture can't be sent out to be fixed. They've been continually getting worse with mold in them, etc. Please help me get these fixed. It's embarrassing and I can't eat what I should be able to. PS – it's now been over three months.

Tegels's office assigned defendant Maassen to handle the complaint. Maassen contacted Onjukka about the complaint. Onjukka's memorandum to Tegels stated:

> Dear Warden, Tammy Maassen asked me to follow up on the complaint from the above referenced inmate [Rzeplinski]. It is affirmed that he requested to have new denture fixed on 04/16/2014. He has sent additional requests for essentially the same thing on 5/6/2014 and 6/18/2014. Each request had been responded to in a timely manner. He was evaluated on 5/13/2014 to determine what his needs are. It was determined that the dentures are repairable. According to his dental record, he will need a procedure in addition to the repair to make the denture function properly. Just sending out the denture for the repair will not properly address his current dental needs. I have informed him that he is on the list, and emergencies such as infection/swelling need to be seen first. As you are aware currently there is no dentist on staff at JCI. We are very hopeful that our recent interview will result in a new dentist. That being said we are very limited in the times that we can see patients that are on the routine dental list. Most all of the available time is used to treat emergent and essential cases that by policy have precedence over non urgent cases such as in this case. Currently the wait time for dentures is over 12 months.

On August 3, 2014, Rzeplinski filed Offender Complaint JCI-2014- 15451, in which he wrote:

> I have been trying to get my new dentures fixed since 4-16-14. HSU called me up to look at them and said, "they can be fixed[]". Since then I have been waiting to no avail. I then wrote a slip addresses to T. Maasen the HSU manager. She never responded to my request and that's when I wrote the Warden, with no response there either. So I now have to seek help from the ICRS. There's no reason my dentures cannot be sent out to be fixed. They have been continually sitting and getting moldy in my denture container. Please help me get these fixed. It is embarrassing and I cannot eat the foods that I should be eating.

Defendant institution complaint examiner Dougherty contacted Onjukka about the grievance. Onjukka told Dougherty that Rzeplinski was on the denture wait list but there were several people in front of him. Dougherty noted that because JCI did not have a dentist, the Dental Services Unit was only able to see those inmates with the urgent/emergent needs first and address non-urgent needs as time permitted. Dougherty recommended that Rzeplinski's offender complaint be "affirmed for statistical purposes." Her recommendations stated in part:

> . . . According to the above staff, Inmate Rzeplinski is on the waiting list to be seen and there are several inmates ahead of him on the list. Because JCI currently does not have a dentist, Dental Services sees those inmates with the urgent/emergent needs first and addresses the non-urgent needs as time permits. Noting the complainant may be required to wait for a dental appointment, it is recommended to affirm this complaint for statistical purposes only. If he has a dental need and absolutely must be seen (i.e. pain, swelling, fever, etc.), he should let DSU know and may submit a request for an appointment with a nurse. Additionally, he may request a soft diet.

On August 20, 2014, Rzeplinski weighed 230 pounds.

On August 28, 2014, as reviewing authority, defendant DeRosa affirmed Dougherty's recommendation, stating:

> Complaint that the patient is unable to get his dentures repaired affirmed. JCI does have dental coverage available for emergent or urgent situations, however, there is no coverage at this time for denture work.

Rzeplinski filed an appeal, stating that it hurt when he ate solid food, and adding that he faced sexual harassment or threats from other inmates:

> Another thing that I complained about in this same matter is being mistreated and talked about. I do not even know these[] guys, but they continue to make comments about how they would like me to do sexual things to them without my teeth in. I am going through pain of multiple sources all because JCI will not simply get my teeth fixed. Do you know what it feels like to have someone of the same sex tell you, "gum my dick" or even "[hey] man I bet you can suck a good dick with those gums of yours."

Defendant Corrections Complaint Examiner Charles Facktor issued a recommendation to affirm the appeal "with no further remedy." Deputy Secretary Deirdre Morgan accepted Facktor's recommendation.

Rzeplinski submitted a dental service request on October 9, 2014 that stated, "I've been subjected to not having my teeth for over 6 months. My self esteem from embarrassment, sexual harassment and pain suffering for trying to eat something other than blended mush as you suggest has gone on long enough. I'm frustrated and pissed!"

Because Rzeplinski raised the issue of sexual harassment in this request, Onjukka contacted his supervisor, De Lap, and reported his concern. Maassen also learned of this request because the Bureau of Health Services received it, and because Onjukka went to her office to tell her about it. Maassen then contacted JCI's Prison Rape Elimination Act Investigator, Wendy Katzmark.

Katzmark and Maassen interviewed Rzeplinski on October 22, 2014. Rzeplinski reported that he had been the subject of jokes by other inmates, but he would not provide

any names of inmates who were making the jokes. They informed him that unless he identifies the individuals who made these comments or jokes, it would be difficult to address those prisoners. He also stated he had not told the individuals that he did not like the comments or to stop. Katzmark and Maassen encouraged Rzeplinski to be in contact with his unit supervisor and to report any problems immediately. They suggested a possible unit move, but Rzeplinski declined and said he was happy where he was. They verified with Rzeplinski that he was able to eat. They also discussed the possibility of giving him more time to eat if he needed it, which he declined.

De Lap emailed Onjukka, telling him that Rzeplinski should be prioritized on the denture wait list and seen as soon as possible to start his dentures. Onjukka said he would start them the following Wednesday.

On October 27, 2014, the DOC secretary's office received a letter from Rzeplinski related to his dentures. He complained about embarrassment, being sexually harassed, and having to eat blended food. The letter was forwarded to the DAI Office and Bureau of Health Services administrator, and then on to De Lap.

On October 29, 2014, Onjukka saw Rzeplinski, at which time he took the full denture for repair. Once the repair was completed, he could complete the permanent reline.[3] Rzeplinski submitted a dental service request later that day stating, "I'm glad you have finally taken my dental need seriously. I've gone thru mental and physical pain for the last 6 ½ months. My gums have been sore and bleeding from trying to eat without teeth (dentures). I

---

[3] Plaintiff suggests that this contradicts Onjukka's earlier statement that there was no need to send the dentures to be fixed because a reline had to be performed. But nothing in the facts suggests that Onjukka intentionally delayed sending the dentures in for repair for the purpose of harming plaintiff.

won't have to wait another 6 ½ months will I?" The next day, Onjukka responded, stating that "when a denture is started we keep working on it. It will be a bit slower than usual. But not too bad. It is usually a couple weeks between appointments."

On November 12, 2014, Rzeplinski reported to health staff that he was frustrated having to wait for his dentures. He made no complaints of pain or any kind of sexual harassment. On December 17, 2014, Rzeplinski submitted a dental service request stating, "My gums are still continuously in pain and sore from not having any teeth (dentures). When will you take this seriously and get my dentures fixed. You try going without teeth. Embarrassing too!" Two days later, Onjukka told Rzeplinski that he would be seen soon for his denture.

Onjukka saw Rzeplinski later that day. At this appointment he did the necessary work so that lab could complete the permanent reline for the dentures. Onjukka observed no signs of swelling or infection. At the appointment, Rzeplinski made no complaints of pain. Rzeplinski still did not have an order for a soft diet, by which I take to mean that he could have chosen a soft diet but turned it down.[4]

On January 6, 2015, Rzeplinski weighed 241 pounds. On January 15, 2015, Rzeplinski received his new, full dentures, which had a good fit. In February 2015, a full-time dentist was hired at JCI.

---

[4] Defendants submit proposed findings contending that plaintiff's dentures broke more often than most people's, and that this was likely because he continually purchased hard candies. Also defendants believe that plaintiff caused himself pain by ordering "cinnamon fireball" candy despite possibly having an allergy to cinnamon that would cause sores in his mouth. But none of this information is material to the analysis below, so I will not consider those proposed findings.

ANALYSIS

To succeed on a motion for summary judgment, the moving party must show that there is no genuine issue of material fact and that he is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party." *Brummett v. Sinclair Broad. Grp., Inc.*, 414 F.3d 686, 692 (7th Cir. 2005). All reasonable inferences from the facts in the summary judgment record must be drawn in the nonmoving party's favor. *Baron v. City of Highland Park*, 195 F.3d 333, 338 (7th Cir. 1999). If the nonmoving party fails to establish the existence of an essential element on which that party will bear the burden of proof at trial, summary judgment for the moving party is proper. *Celotex*, 477 U.S. at 322.

The Eighth Amendment prohibits prison officials from acting with deliberate indifference to prisoners' serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 103-04 (1976). A "serious medical need" may be a condition that a doctor has recognized as needing treatment or one for which the necessity of treatment would be obvious to a lay person. *Johnson v. Snyder*, 444 F.3d 579, 584-85 (7th Cir. 2006). A medical need may be serious if it is life-threatening, carries risks of permanent serious impairment if left untreated, results in needless pain and suffering, significantly affects an individual's daily activities, *Gutierrez v. Peters*, 111 F.3d 1364, 1371-73 (7th Cir. 1997), or otherwise subjects the prisoner to a substantial risk of serious harm. *Farmer v. Brennan*, 511 U.S. 825, 847 (1994).

To be considered "deliberately indifferent," an official must know of and disregard "an excessive risk to an inmate's health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must

also draw the inference." *Snipes v. Detella*, 95 F.3d 586, 590 (7th Cir. 1996). However, inadvertent error, negligence, gross negligence, and ordinary malpractice are not cruel and unusual punishment within the meaning of the Eighth Amendment. *Vance v. Peters*, 97 F.3d 987, 992 (7th Cir. 1996).

## A. Medical need

There is no question that if the lack of dentures caused Rzeplinski pain or kept him from obtaining adequate nutrition, defendants ignoring those problems could be liable under the Eighth Amendment. *See, e.g.*, *Wynn v. Southward*, 251 F.3d 588, 593 (7th Cir. 2001) (allegations of failure to provide dentures that resulted in difficulty chewing food, bleeding, and headaches sufficient to survive motion to dismiss); *Antonelli v. Sheahan*, 81 F.3d 1422, 1432 (7th Cir. 1996) (prisoner's diet must provide adequate nutrition). But although Rzeplinski contends that he was indeed in pain, there is no evidence that defendants were made aware of a serious medical need.

Defendants make clear the mere fact of being toothless is not in itself a priority medical concern. Defendants placed him on a "routine"-level wait list for dentures, which was quite long because of staffing shortages. But delay in treatment does not violate the Eighth Amendment when there is no substantial risk of harm. Defendants explain that toothless prisoners are offered a soft diet, which may not be as pleasant as the usual diet, but remove the concern of pain caused by eating the standard prison meals. In the first several months without dentures, Rzeplinski's dental requests did not mention pain, swelling, weight loss, or any signs of infection. Even so, defendant Warden Tegels responded to Rzeplinski's "Interview/Information Request" by having defendant Maassen investigate. Onjukka explained to her the staffing shortage and that Rzeplinski did not have an urgent medical

need. Tegels acted reasonably in delegating the investigation to Maassen. *Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009) (high-level prison officials are "entitled to relegate to the prison's medical staff the provision of good medical care." Maassen was not deliberately indifferent for investigating by directing Onjukka to explain the situation and for relying on his dental expertise.

Defendant Onjukka responded reasonably to this inquiry and Rzeplinski's requests, given the circumstances. Routine dental issues were put on the back burner given the personnel shortage. Defendant Dougherty responded to Rzeplinski's inmate grievance by contacting Onjukka and learning about the reasons for delay. She told Rzeplinski that the delay was the result of the staffing shortage and that he should seek medical help if he had a problem like pain, swelling, or a fever. Defendant DeRosa approved this recommendation. Defendants Facktor and Morgan denied his appeal. Without Rzeplinski alerting defendants to a serious medical need, their actions were not deliberately indifferent.

Rzeplinski also names defendant complaint examiner Welcome Rose as a defendant, but he does not propose any facts indicating that she was involved in any of the events of this case. I will dismiss his claim against her.

Rzeplinski eventually did raise the issue of pain in an October dental request, but he phrased it in terms of "pain suffering for trying to eat something other [than] blended mush as you suggest has gone on long enough." He also stated that he was being sexually harassed. Onjukka did not consider the pain a serious concern because it was caused by Rzeplinski choosing not to eat a soft diet as recommended. Onjukka was not deliberately indifferent given that Rzeplinski had options open to him to avoid hurting his gums. Onjukka relayed

the sexual harassment allegations to defendant De Lap. I will address the sexual harassment issue below.

Rzeplinski filed dental requests in October and December 2014 discussing pain, but by then, his treatment had already been prioritized because of his sexual harassment allegations, and Onjukka had already begun the process of completing the treatment, by sending the dentures to the lab. In December 2014, Onjukka worked on fixing the dentures and Rzeplinski received them in January 2015. In the course of this treatment, Onjukka observed no swelling or infection and noted that Rzeplinski was not eating a soft diet. Rzeplinski also gained weight during the time he had no dentures, and he does not proposed any facts suggesting that he was harmed nutritionally during this time. These facts show that Onjukka worked to complete the repair while also observing no significant medical problem, so I conclude that he was not deliberately indifferent to a serious medical need.

Rzeplinski also refers to a letter he sent to then-DOC Secretary Wall discussing his denture problems, including the pain caused by eating solid food. This letter was referred to the Division of Adult Institutions and then defendant De Lap. This action does not violate the Constitution: high-level government officials are free to delegate complaints to subordinate staff, and Rzeplinski does not provide any evidence suggesting that this decision was made to quash an investigation or otherwise harm him.

Finally, Rzeplinski argues that the delay in treatment was caused by De Lap's failure to hire a new JCI dentist sooner. But Rzeplinski has not shown that he actually faced a serious medical need from the delay for a "routine" dental problem, and even if he had, he does not provide any facts suggesting that De Lap intentionally dawdled in the hiring process. Rather, she explains that it is difficult to hire dentists at JCI's location. And

Rzeplinski has received the treatment he sought and a new dentist has been hired, so there is no reason to consider injunctive relief about the delays. Because all of Rzeplinski's medical care claims fail, I will grant defendants' motion for summary judgment.[5]

## B. Sexual harassment

In his complaint, Rzeplinski alleged that he was being threatened with sexual abuse from other inmates. I did not allow him to proceed with those claims because he did not explain which of the defendants named in the complaint were made aware of the sexual threat problem and how they addressed it. I told Rzeplinski that he "remain[ed] free to renew his [request to proceed with threat claims], but he will have to provide new allegations explaining which of the defendants he alerted to the sexual threat problem and how they responded." Rzeplinski did not renew his motion, but it is clear from his summary judgment submissions that he continues to think that prison officials were deliberately indifferent to this problem.

Prison staff investigated the problem in October 2014, following a dental request by Rzeplinski. Rzeplinski seems to be saying that all of the defendants handling this investigation were also deliberately indifferent to him, but even if such claims were part of this case, no reasonable jury could come to that conclusion. Onjukka was concerned about these allegations so he contacted De Lap and Maassen. Maassen contacted the Prison Rape Elimination Act investigator and they both interviewed Rzeplinski. Because of the interview, De Lap directed Onjukka to prioritize the denture repair.

---

[5] Plaintiff now seems to be saying that he suffered embarrassment and that he suffered a loss of dignity by being forced to eat a soft diet. But he did not bring claims to this effect in his complaint. Even if he had, it is likely that defendants would be entitled to qualified immunity on this issue, because previous cases in this circuit regarding the provision of dentures to prisoners focus only on the tangible medical problems potentially caused by a lack of teeth.

All of these steps show that defendants were concerned about the problem and attempted to help Rzeplinski. Rzeplinski did not tell them the names of the inmates who made the offensive comments. In his brief, Rzeplinski says this is because he did not want to be labeled a snitch, which is understandable. But he also does not dispute that when Maassen and the PREA investigator suggested a possible transfer, Rzeplinski declined and said he was happy to stay where he was. They told him to report any further problems. Maassen's actions show that she attempted to resolve the problem, and given Rzeplinski's response, no reasonable jury could conclude that she was deliberately indifferent.[6]

ORDER

IT IS ORDERED that:

1. Defendants' motion for summary judgment, Dkt. 27, is GRANTED.

2. The clerk of court is directed to enter judgment in defendants' favor and close this case.

Entered March 28, 2017.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge

---

[6] Plaintiff also raised the sexual-comment problem in the appeal of his grievance discussed above, and defendants Facktor and Morgan dismissed the appeal without performing any investigation. But because other prison staff investigated the problem and plaintiff said that he did not want to move, there is no reason to consider allowing plaintiff to amend his complaint at this late stage to include claims against these defendants.